# IN THE COURT OF APPEALS OF IOWA

No. 24-0693
Filed October 2, 2024

**IN THE INTEREST OF A.L. and E.L.,**
**Minor Children,**

**S.L., Mother,**
      Appellant.
_____

   Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block,

Judge.


   A mother appeals the termination of her parental rights.  **AFFIRMED.**


   Andrea M. Flanagan and Sandra C. Kromminga of Flanagan Law Group,

PLLC, Des Moines, for appellant mother.

   Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney

General, for appellee State.

   Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, attorney and

guardian ad litem for minor children.


   Considered by Greer, P.J., and Ahlers and Badding, JJ.

**BADDING, Judge.**

A mother stuck in a cycle of domestic violence with the father of her two children, born in 2009 and 2013, appeals the termination of her parental rights under Iowa Code section 232.116(1)(f) (2023).[1]  She challenges the juvenile court's findings that the children cannot be returned to her custody because of her toxic relationship with the father and that termination is in their best interests.  We affirm on our de novo review of the record.[2]

I.    **Background Facts and Proceedings**

Close to twenty years ago, the mother's parental rights to her two oldest children were terminated because her "pattern and history of choices with men who have criminal and substance abuse issues will only continue to place the children at risk."  One of those men was the father of the two children at issue here.  The mother married him in 2008, starting the family on what the juvenile court termed as a "dysfunctional rollercoaster ride."

A low point of that ride was in July 2020, when the Iowa Department of Health and Human Services received a report alleging that the father was drinking "about a fifth of alcohol per day" and experiencing suicidal thoughts while holding a loaded gun.  The report also alleged that the parents were using methamphetamine while caring for their children.  The parents admitted the drug use, and the father was involuntarily committed for his mental health.  Once he

---

[1] The father does not appeal.

[2] In conducting this review, "[w]e are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses."  *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022) (citation omitted).  "Our primary concern is the best interests of the child[ren]."  *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

was discharged from the hospital, the department created a safety plan with the parents that included an agreement to "not engage in domestic violent behavior in front of the kids" and "abstain from illegal substance use." Family preservation services were put into place, and the parents engaged in couple's counseling.

Yet, the next month, the father was charged with domestic abuse assault after knocking the mother to the ground and strangling her. A criminal no-contact order was entered but canceled at the mother's request. The father moved back into the family's home and resumed counseling with the mother. But they soon had another domestic incident, and the father "was again safety planned out of the home." The department case manager noted the mother "has gone back and forth a great deal in regards to if she feels safe with him in the home or not. One minute she will state she is fearful and the next will state she never said that and wants him back home." The father returned to the home again, and the cycle continued. With the children "express[ing] fear and anxiety over the level of conflict in the home," the State filed petitions in January 2021 to have them adjudicated as children in need of the court's assistance.

A few days before the adjudicatory hearing in February, the father was arrested and charged with another domestic abuse assault against the mother. She quickly moved to modify, and then cancel, the resulting no-contact order. The juvenile court granted the child-in-need-of-assistance petitions in May, and the children remained in their parents' custody under the department's protective supervision. The oldest child started participating in therapy to address his high anxiety and nervous tics. The mother said the family situation was also causing problems for the youngest child, who was "quite emotional at times." An individual

counselor for the mother reported, "All family members are walking on egg shells. The kids are afraid of [the father] when he yells. The kids have seen the cops show up to their house. [The mother] seems to be in some denial about the severity of the abuse in the house."

Over the next few months, the parents reported one another to the police, obtained and then dismissed civil protective orders, and missed drug testing. The father was subject to another involuntary mental-health committal and jailed for violating a protective order, while the mother was arrested for harassing the father. Before the dispositional hearing in July, the oldest child told his therapist "that his parents need to be apart and remain separated." After that hearing, the court continued the children in their parents' custody but in their mother's care with visitation for the father. The father was released from jail at the end of August, the protective orders were dismissed the next month, and the father was living with the family again by October.

Before long, the parents were fighting again, culminating with an extended incident in January 2022 that resulted in multiple calls to one of the family's service providers and the police. The father reported the mother "had hit and kicked him" and broke down the back door to the house, while the mother said the father locked her and the children out of the house, which he then "trashed." A couple of weeks later, the mother had a positive hair test for methamphetamine. She eventually admitted relapsing and reported the father was using methamphetamine too. The children were removed from their parents' custody in February, with the department noting, "The parents have been in crisis almost everyday due to their unstable relationship."

After the children's removal, the parents started a slow climb back up the rollercoaster. They obtained psychological evaluations, which resulted in a bipolar diagnosis for the father and chronic post-traumatic stress disorder for the mother. Both parents reengaged with individual therapy, substance-use treatment, and couple's counseling. Despite some bumps along the way—including positive drug tests for the mother in March, missed drug tests for the father, and continued arguments—the department was considering semi-supervised visits in October. By then, the mother had completed her substance-use treatment and was engaged in aftercare. She was regularly attending individual therapy, and the couple was successfully discharged from marital counseling. The father had also completed his substance-use treatment and provided negative drug tests. Parent-child relationship assessments were completed, and family therapy was recommended.

Those sessions started in November. Because of the parents' significant progress, the department moved them to semi-supervised visitation. But the children were soon reporting "that mom and dad still argue at times, and they are worried about escalations." Despite those reports, the department was still prepared to transition to an unsupervised visitation plan with overnights. Before that plan could be implemented, the parents' relationship entered another violent cycle. In February 2023, the mother alleged that the father had been stalking her and that he spit in her face, hid in the house when she was making plans to move out, and damaged the mirror on her vehicle. The children requested more supervision at visits because of their parents' fighting. The youngest child was struggling in school, sleepwalking, bed-wetting, and experiencing nightmares. She was later diagnosed with post-traumatic stress disorder, along with unspecified

depressive disorder and anxiety. The oldest child stopped participating in extra phone calls with his parents, parenting education sessions, and individual counseling. And he was experiencing a dip in his grades at school. So the department returned the parents to fully supervised visits, noting their volatile relationship "continues to be a concern and greatly impacts the children."

The mother obtained her own residence in March and filed for divorce from the father. He was arrested in April for breaking into the mother's new home and charged with second-degree burglary. Criminal and civil no-contact orders were issued. While the children reported feeling safe when they were with the mother, they feared their father. The youngest child was also presenting some challenging behaviors for the foster parents, who asked the department to find her another home. They were willing to keep the oldest child in their home, however, and open to adopting him. With these developments, the State petitioned to terminate the parents' rights in May 2023.

In July, the no-contact orders between the parents were dismissed. Less than a week later, they were "in crisis" for several days, with the mother calling the police for a welfare check on the father, who "was in a 'dark place' mentally." Early the next morning, the father went to the mother's home and threatened her. Yet, in August, the mother asked the father to drive her to a medical appointment. And she recanted the allegations that she made against him in April.

A termination hearing was held at the end of August. The court considered a letter from the youngest child's therapist, which stated that termination of her mother's parental rights would not be in the child's best interests. The children also wrote letters to the court stating they wanted "to go home with [their] mom"

because she was "doing everything she is supposed to." The mother echoed that sentiment, testifying: "I know that I haven't always made the best choices, but I also have worked really hard. . . ." She agreed that her relationship with the father was toxic and testified that she intended to follow through with the divorce. The department's case manager was skeptical, noting that despite years of counseling, the parents are "continuously in crisis or engaging in the relationship."

Faced with this evidence, the juvenile court found that while a statutory ground may have been proven, "it is in the best interests of the children that the court defer permanency" under Iowa Code section 232.104(2)(b). The court noted that the mother "has actively engaged in services being offered," "consistently demonstrated sobriety for over the last twelve months," and maintained suitable housing and employment. But the court remained concerned by the parents' relationship and the father's "unmet mental health and substance abuse," along with the youngest child's "mental and emotional well-being [and] lack of concurrent placement." To address some of these concerns, the court ordered that the parents "shall not both be present during any visitation" with the children; "[n]either parent shall engage in any acts of domestic violence"; and each was expected to "demonstrate that the children can be returned to the care of a parent without being subject to domestic violence."

After this hearing, the department's case manager found a new foster home for the youngest child about an hour-and-a-half away from her parents and brother. Although the parents' visits with the child were separate, they drove there together at least twice. The mother gave the father rides to other places, paid some of his bills, and sometimes spent the night at his house. With this continued contact, the

court-appointed special advocate noted "there have been almost monthly inappropriate interactions between the couple. . . . There are angry texts, angry phone calls, and calls to the police." Both parents installed cameras at their homes and obtained new phone numbers. But they soon started contacting each other again. And their divorce remained in limbo. The juvenile court accordingly reset the termination hearing for April 2024.

A few weeks before that hearing, the parents had another argument, during which they both contacted the police for help. And then, the weekend before the hearing, the parents argued again because the mother found out the father "was talking to another girl," which the father said made her "pretty upset." The department's case manager accordingly noted in her report, "The parents have done little to demonstrate that they have ended their relationship; or that they are living in separate residences." The juvenile court agreed in its termination ruling, finding: "Neither parent has demonstrated their ability to protect the children from their toxic relationship. Although both parents voice the importance of protecting their children from domestic violence, their actions and deception throughout the juvenile court's supervision reflect that they have no appreciation of the dangers their relationship poses." The mother appeals.

## II.    Analysis

Although we perform a three-step analysis in conducting our de novo review of termination of parental rights, *see In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010), the mother challenges only two of those steps—whether a statutory ground for termination is satisfied, and whether the children's best interests are served by

termination. We accordingly focus on those steps.[3] *See id.* (stating we need not address a step the parent has not disputed).

On the statutory ground, the mother argues "[t]here is not clear and convincing evidence that the children cannot be returned to [her] custody due to her relationship" with the father. *See* Iowa Code § 232.116(1)(f)(4) (requiring clear and convincing evidence that the child cannot be returned to parental custody "at the present time"); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). She points to her engagement in services, including individual therapy, family therapy, and couple's counseling, as evidence that she has "ensure[d] that the children's well-being is not impacted *by her ongoing relationship*" with the father. (Emphasis added.) But that argument says it all—despite the mother testifying several times that her relationship with the father was over, it was not. And it was still volatile, with the parents' arguments continuing right up to the weekend before the termination hearing, even after all the services provided to them. The mother knew the children wanted to be with her "but not if I was home with their dad." Yet she continued her relationship with him. So while the mother

---

[3] The mother's petition on appeal challenges the final element in Iowa Code section 232.116(1)(h). We consider her argument as a challenge to the final element of the ground under which her parental rights were terminated, section 232.116(1)(f), which is essentially identical to the final element in section 232.116(1)(h). *See In re J.S.*, No. 24-0503, 2024 WL 2842232, at *1 n.1 (Iowa Ct. App. June 5, 2024). We do not, however, address the bond exception in section 232.116(3)(c). While the mother mentioned that exception in the supporting legal authority section for her challenge to the statutory ground for termination, "sprinkled mentions of an issue" are insufficient to raise legal claims for our consideration. *In re K.P.*, No. 23-1661, 2024 WL 260885, at *3 (Iowa Ct. App. Jan. 24, 2024).

made progress in other areas, like her sobriety, "her domestically violent relationship with the father was enough to prevent" safely returning the children to her custody. *In re J.K.*, No. 24-0561, 2024 WL 3292695, at *3 (Iowa Ct. App. July 3, 2024); *accord In re Z.B.-D.*, No. 08-1221, 2008 WL 4877943, at *2 (Iowa Ct. App. Nov. 13, 2008) (finding the children couldn't be safely returned to the mother's custody where the "primary if not sole impediment to reunification was" her domestically violent relationship).

As for the children's best interests, the mother repeats that "[s]he has addressed her domestically abusive relationship with [the father] by meaningfully engaging in mental health treatment." For the same reasons discussed above, the record shows that's not true. Over the course of their marriage, the mother has called the police about the father close to fifty times. Since 2019, she has filed and dismissed four civil protective orders against him. And she has gotten at least three criminal no-contact orders canceled, most recently in May 2023. So even though the mother attended individual therapy weekly, she kept repeating the same domestic violence cycle with the father. *See In re D.G.*, No. 18-1908, 2019 WL 719174, at *3 (Iowa Ct. App. Feb. 20, 2019) ("We hold no crystal ball, and to some extent, the best-interests determination must be made upon past conduct." (cleaned up)).

The mother also argues that her individual therapist "stated that she has no concerns with [the mother's] ability to be able to care" for the youngest child. Although there were therapists involved with the family who did not recommend terminating the mother's parental rights, other professionals did, including the department's case manager, the children's guardian ad litem, and the court-

appointed special advocate. The court considered all these opinions before determining

> it would be detrimental to the children's physical, mental and emotional well-being by maintaining a parent/child relationship. The children have experienced serious emotional problems, obviously arising from the turbulence and violence within their birth family. Because of the substantial risk [the children] would confront if returned to a parent's care, termination is in their best interests. . . . [The children] deserve the opportunity for a stable, nurturing environment, free from the threat of physical and emotional abuse, and the parents' historical cycle of domestic violence.

We agree with the juvenile court upon our de novo review of the record. *See* Iowa Code § 232.116(2) (directing the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child").

For these reasons, the court's ruling terminating the mother's parental rights is affirmed.

**AFFIRMED.**